CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

May 03, 2024

LAURA A. AUSTIN, CLERK
BY:
s/A. Beeson
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **BRIAN LEON HAMLET,** | ) | |
| **Plaintiff,** | ) | **Case No. 7:20-cv-00013** |
| | ) | |
| **v.** | ) | |
| | ) | **By: Michael F. Urbanski** |
| **DOUG A. IRVIN, et al.,** | ) | **Chief United States District Judge** |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Brian Leon Hamlet, a former Virginia inmate proceeding pro se and in forma pauperis, filed this civil action under 42 U.S.C. § 1983 against Doug Irvin, Vanessa Duncan, and Travis Cassell. Hamlet claims that the defendants violated his federal constitutional rights by requiring him to wear a Global Positioning System (GPS) device as a condition of his state probation. He seeks to recover damages from the defendants in their individual capacities.

On September 13, 2021, the court dismissed the case without prejudice for failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1), and denied the defendants' motion for summary judgment as moot. In doing so, the court determined that Hamlet's claims were barred by Heck v. Humphrey, 512 U.S. 477 (1994). On appeal, the United States Court of Appeals for the Fourth Circuit concluded that the defendants forfeited the Heck issue by failing to dispute Hamlet's assertion that the decision did not bar his claims and that this court erred in summarily dismissing the complaint on the basis of Heck. Hamlet v. Irvin, No. 21-7477, 2023 WL 3478408, at *1 (4th Cir. May 16, 2023). The Fourth Circuit further concluded that this court "should consider [the defendants' motion for summary judgment] and Hamlet's response before deciding whether Hamlet states

a claim on which relief may be granted under § 1983." Id. Accordingly, the Fourth Circuit vacated the dismissal order and remanded the case for further proceedings consistent with its opinion. Id.

In their motion for summary judgment, the defendants assert the defense of qualified immunity. For the reasons set forth below, the court concludes that the defense bars each of Hamlet's claims under § 1983. Therefore, the defendants' motion for summary judgment, ECF No. 23, is **GRANTED**.

## I.      Background

The following facts are primarily taken from Hamlet's verified complaint, defendant Duncan's affidavit, and their accompanying exhibits. The facts are either undisputed or presented in the light most favorable to Hamlet, the nonmoving party on summary judgment.

On February 18, 2014, Hamlet was found guilty of malicious wounding in the Circuit Court of Montgomery County, Virginia. Sentencing Order, Compl. Ex. A, ECF No. 1-1 at 1. He appeared for sentencing on May 20, 2014. Id. The circuit court sentenced Hamlet to a term of imprisonment of 15 years, within 10 years suspended. Id. at 2. The conditions of Hamlet's suspended sentence including the following:

> **Good Behavior:** The defendant shall be of good behavior for 10 years . . . from the defendant's release from confinement[.]
>
> **Supervised Probation:** The defendant is placed under the supervision of a Probation Officer to commence . . . upon release from incarceration for 5 years . . . . The defendant shall comply with all the rules and requirements set by the Probation Officer. Probation shall include substance abuse counseling and/or testing as prescribed by the Probation Officer.

Id. at 3. The circuit court further ordered that Hamlet was "not to have any contact with the victim." Id. at 4. The sentencing order did not include any additional requirements in the section for "[s]pecial conditions." Id. at 3.

On January 5, 2018, Hamlet was released from the custody of the Virginia Department of Corrections (VDOC) to the supervision of the District 28 Probation and Parole Office in Radford, Virginia. Duncan Aff., ECF No. 24-1, ¶ 6. Hamlet met with Duncan, his assigned probation officer, who reviewed his conditions of supervised probation with him and informed him that she was placing him on GPS monitoring. Compl. 9. Hamlet objected on the basis that the circuit court had not ordered GPS monitoring and asked Duncan who had authorized it. Id. Duncan informed Hamlet that she and other members of the probation staff, including Irvin and Cassell, had determined that he needed to be placed on GPS monitoring. Id. at 10.

Duncan's affidavit explains that offenders "may be assigned to GPS monitoring by the supervising Probation and Parole (P&P) District's screening committee—which is made up of a group of P&P staff members that review cases to determine an offender's eligibility and priority for placement on GPS or voice recognition monitoring." Duncan Aff. ¶ 7 (citing VDOC Operating Procedure (OP) 435.5, Electronic Monitoring Program). OP 435.5 permits "P&P Offices [to] make discretionary use of Electronic Monitoring as a supervision tool for high-risk cases . . . ." VDOC OP 435.5 § IV(A)(3) (Sept. 1, 2018), available at https://web.archive.org/web/20190819171722/https://vadoc.virginia.gov/files/operating-

procedures/400/vadoc-op-435-5.pdf (last visited May 1, 2024).[1] The policy then lists several categories of offenders for which electronic monitoring may be used as a supervision tool, including "[o]ffenders whose behavior or history justifies referral by the supervising Officer." Id. According to the defendants' evidence, which has not been disputed by Hamlet, the decision to place Hamlet on GPS monitoring was "deemed necessary due to his history of violence and threatening behaviors," including evidence that Hamlet had threatened to kill a judge, prosecutors, law enforcement officers, and Virginia Tech students following a court appearance in 2014. Duncan Aff. ¶ 7.[2] The defendants also found GPS monitoring to be appropriate in light of Hamlet's particular supervision needs, including the need to ensure that he complied with the circuit court's requirement that he not have contact with the victim of the malicious wounding. Id.

Duncan presented Hamlet with several forms to sign, including a Conditions of Probation Supervision form, GPS Monitoring Rules, and an Electronic Monitoring Equipment Assignment and Receipt form. Duncan Aff. Encls. A, B, ECF No. 24-1 at 6–8. Hamlet objected to signing the forms and informed Duncan that he wanted an "attorney and a hearing" on the GPS monitoring requirement. Compl. 10. After hearing the conversation between Hamlet and Duncan, Cassell appeared with a GPS ankle bracelet and directed Hamlet to sign the forms. Id. When Hamlet balked at doing so, Duncan and Cassell informed him

---

[1] Although OP 435.5 is not in the record, the court is entitled to take judicial notice of it. Gordon v. Schilling, 937 F.3d 348, 353 n.6 (4th Cir. 2019).

[2] In his response to the defendants' motion, Hamlet does not deny making the threats referenced in Duncan's affidavit. Instead, he asserts that the circuit court "heard this evidence" and nonetheless did not impose GPS monitoring as a special condition of supervised probation. Pl.'s Resp. M. Summ. J., ECF No. 28, at 5, 13.

that they would have him "lock[ed] back up" if he did not comply with their instructions. Id. at 10–11.

Hamlet ultimately signed all of the forms presented by Duncan. By signing the Conditions of Probation Supervision form, Hamlet agreed to follow 11 additional conditions, including a condition requiring that he "maintain regular employment"; a condition requiring that he "follow the Probation and Parole Officer's instructions" and "be truthful, cooperative, and report as instructed"; and a condition requiring that he "not use alcoholic beverages." Duncan Aff. Encl. A. By signing the GPS Monitoring Rules, Hamlet agreed to keep the GPS ankle bracelet within 50 feet of him at all times and to not enter the "exclusion zone," which was defined as the "victim [and] mother's home." Duncan Aff. Encl. B.

After Hamlet signed the forms, Duncan and Cassell secured the bracelet around Hamlet's left ankle. Compl. 5, 11. Cassell also programmed the device to activate if Hamlet violated his 10:00 p.m. curfew. Id. at 10; see also Duncan Aff. ¶ 8 (explaining that Probation and Parole District 28 paid for temporary housing at the Travel Inn Motel in Pulaski County since Hamlet did not have a home plan or residence upon his release from incarceration and that Hamlet was subject to a curfew as a condition of receiving temporary housing).

Hamlet wore the GPS ankle bracelet until late August 2018. See Compl. 6. On August 23, 2018, the manager of the Travel Inn Motel informed Duncan that Hamlet would no longer be allowed to stay at the motel after punching holes in the wall and causing other damage to his room. Duncan Aff. ¶ 10; see also id. ¶ 9 (describing a similar incident that occurred on March 29, 2018, after which Hamlet admitted to punching the wall). Motel employees also reported that Hamlet had been drinking alcohol, which was a violation of his conditions. Id.

¶ 10. Additionally, Hamlet had not maintained regular employment. Id. That same day, a probation violation warrant was issued for Hamlet's arrest, and "[u]pon being taken into custody at the [New River Valley Regional Jail], the GPS device was removed." Id.

On January 8, 2019, Hamlet was found to have violated his conditions of supervised probation. Id. ¶ 12. The circuit court "revoked Hamlet's previously suspended sentence, but re-suspended the remaining time after giving him credit for time served, as well as 5 years supervised probation." Id.

On January 31, 2019, after being returned to supervision, Hamlet was placed on "Shadow Track (voice recognition) monitoring." Id. ¶ 13. Less than three months later, on April 11, 2019, Hamlet was arrested again for violating his conditions of probation after being found guilty of more than one charge of public swearing/intoxication. Id. ¶ 14; see also Duncan Aff. Encl. F, ECF No. 24-1 at 15–16. On August 19, 2019, the circuit court revoked Hamlet's suspended sentence and required him to serve an active term of incarceration of one year and six months. Duncan Aff. ¶ 15.

## II.    Procedural History

On January 7, 2020, while serving the sentence imposed by the circuit court, Hamlet filed this action under 42 U.S.C. § 1983 against Duncan, Cassell, and Irvin. Hamlet claims that the defendants conspired to violate, and did violate, his federal constitutional rights by requiring him to wear a GPS device "without a court order" or a "hearing on the matter." Compl. 4. In particular, Hamlet alleges that the defendants' conduct violated (1) his Fourteenth Amendment right to due process, id. at 3–6, 17–19; (2) his Fourth Amendment right to be free from unreasonable searches and seizures, id. at 3–5, 18–23; (3) his First Amendment right

to travel freely, id. at 19; (4) the Eighth Amendment's protection against cruel and unusual punishment, id. at 8, 19–23; and (5) the Double Jeopardy Clause of the Fifth Amendment, id. at 20–21. Hamlet also invokes the "unconstitutional conditions doctrine" in describing Duncan and Cassell's alleged threats to send him back to jail if he did not sign the GPS monitoring forms. See id. at 8–11, 15, 21. He seeks $6 million in compensatory damages and $6 million in punitive damages against each defendant in his or her individual capacity. Id. at 4, 23–24.

The defendants moved for summary judgment on each of Hamlet's constitutional claims. The defendants contend that the claims fail on the merits and that they are entitled to qualified immunity. See Def.'s Br. Supp. M. Summ. J. 9–19, ECF No. 24. Hamlet filed a response to the defendants' motion, ECF No. 28, and the motion is now before the court for consideration following remand from the Fourth Circuit.

### III.    Standard of Review

When ruling on a motion for summary judgment, the court "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." Shaw v. Foreman, 59 F.4th 121, 129 (4th Cir. 2023). The court is required to grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### IV.    Discussion

#### A.  Section 1983 and Qualified Immunity

Section 1983 is "a vehicle for vindicating preexisting constitutional and statutory rights." Safar v. Tingle, 859 F.3d 241, 245 (4th Cir. 2017). The statute provides that a person

acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.

State officers "sued in their individual capacities under § 1983 may invoke the doctrine of qualified immunity, which shields 'government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Aleman v. City of Charlotte, 80 F.4th 264, 284 (4th Cir. 2023) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).[3] The test for qualified immunity has two prongs: (1) whether the facts "make out a violation of a constitutional right" and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. Pearson, 555 U.S. at 232. "If the answer to either question is 'no,' the officer being sued is entitled to qualified immunity." Aleman, 80 F.4th at 284. Courts are "permitted to exercise their sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances in the particular case." Pearson, 555 U.S. 48 at 236. Upon review of the record, the parties' arguments, and applicable law, the court finds it appropriate to proceed directly to the second prong in this case.

With respect to the second prong, the Supreme Court has explained that a constitutional right is clearly established if "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002). "To determine whether a right is clearly established, [courts typically] assess

---

[3] Unless otherwise noted, the court omits internal quotation marks and citations throughout this opinion.

whether the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." <u>Wilson v. Prince George's Cnty.</u>, 893 F.3d 213, 221 (4th Cir. 2018). When "there are no such decisions from courts of controlling authority, [courts] may look to a consensus of cases of persuasive authority from other jurisdictions, if such exists." <u>Booker v. S.C. Dep't of Corr.</u>, 855 F.3d 533, 538–39 (4th Cir. 2017). "Either way, these sources must have placed the statutory or constitutional question beyond debate." <u>Sharpe v. Winterville Police Dep't</u>, 59 F.4th 674, 683 (4th Cir. 2023). Although a previous case directly on point is not required, <u>id.</u>, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply," <u>District of Columbia v. Wesby</u>, 583 U.S. 48, 63 (2018). "Otherwise, the rule is not one that every reasonable official would know." <u>Id.</u>

"The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." <u>Id.</u> "The dispositive question is whether the violative nature of <u>particular</u> conduct is clearly established." <u>Mullenix v. Luna</u>, 577 U.S. 7, 12 (2015). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>Id.</u> "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situated he confronted." <u>City of Tahlequah v. Bond</u>, 595 U.S. 9, 11 (2021).

## B. Fourteenth Amendment

Hamlet first claims that the defendants violated his right to "procedural due process" under the Fourteenth Amendment by assigning him to GPS monitoring without a hearing or

a court order. Compl. 5. The Due Process Clause of the Fourteenth Amendment prohibits state officials from depriving "any person of life, liberty, or property without due process law of law." U.S. Const. amend. XIV. "To prevail on a procedural due process claim, a plaintiff must show (1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." Accident, Injury & Rehabilitation, PC v. Azar, 943 F.3d 195, 203 (4th Cir. 2019) (internal quotation marks omitted).

The Supreme Court has explained that a protected liberty interest may arise "from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005). Hamlet appears to contend that he had a protected liberty interest arising from both sources. For the following reasons, the court concludes that it was not clearly established that his assignment to GPS monitoring implicated a protected liberty interest.

First, existing precedent did not clearly establish that the Constitution itself gives rise to a liberty interest in avoiding assignment to GPS monitoring while on supervised probation. Although Hamlet correctly notes that "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause," Foucha v. Louisiana, 504 U.S. 71, 80 (1992), the Supreme Court and the Fourth Circuit have applied this principle in cases involving actions that physically restricted an individual's movements, such as incarceration, civil commitment to a mental hospital, or the application of shackles or similar physical restraints. See Turner v. Rogers, 564 U.S. 431, 445 (2011) (explaining that "loss of personal liberty through imprisonment" is sufficient to trigger due process protections); Foucha, 504

U.S. at 80 (concluding that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protections."); Youngberg v. Romeo, 457 U.S. 307, 314–16 & n.4 (1982) (concluding that shackling an involuntarily committed individual implicated the liberty interest in "freedom of movement" or "freedom from bodily restraint"); H.H. v. Moffett, 335 F. App'x 306, 313 (4th Cir. 2009) (finding that "a reasonable teacher would know that maliciously [strapping] a child in her chair for hours at a time interferes with that child's constitutional liberty interests"). This principle has also been applied in cases involving the forcible administration of antipsychotic drugs. See United States v. Charters, 863 F.2d 302, 305 (4th Cir. 1988) ("In this circuit, we have held, based in part upon the Supreme Court's recognition in Romeo of a protectible liberty interest in freedom from bodily restraint, that the forcible administration of antipsychotic drugs presents a sufficiently analogous intrusion upon bodily security to give rise to such a protectible liberty interest."); accord Washington v. Harper, 494 U.S. 210, 221 (1990). As other courts observed, "[h]aving to wear a GPS ankle monitor is less restrictive . . . than being in jail or prison, or . . . civilly committed, which realistically is a form of imprisonment." Belleau v. Wall, 811 F.3d 929, 932 (7th Cir. 2016). It is also less intrusive than being forcibly medicated. The GPS device merely identifies the location of the individual wearing it, id. at 936; the device does not physically restrict the individual's bodily movements. Given these distinctions, the court cannot say that "every reasonable official" in the defendants' position would have known that the Due Process Clause itself confers a liberty interest in avoiding assignment to GPS monitoring. Wesby, 583 U.S. at 63. Indeed, other courts as of that time had held to the contrary in similar circumstances. See Smith v. Kimbhal, 421 F. App'x 377, 380 (5th Cir. 2011) (affirming the dismissal of a due

11

process claim arising from the imposition of certain conditions of supervision and noting that "[n]either the Fifth Circuit nor the Supreme Court has afforded inmates a protected liberty interest in not having . . . electronic monitoring conditions imposed as a condition of mandatory supervised release"); Chandler v. United States Parole Comm'n, 60 F. Supp. 3d 205, 222 (D.D.C. 2014) (concluding that "GPS monitoring and curfew requirements" imposed by the United States Parole Commission did not implicate a protected liberty interest).

Nor was it clearly established at the relevant time that Hamlet had a state-created liberty interest in avoiding being placed on GPS monitoring while on supervised probation or that such condition could not be imposed without a hearing or a court order. "To establish a state-created liberty interest, [a plaintiff] must point to statutes or regulations that give rise to an expectation of that interest." Bowling v. Dir., Va. Dep't of Corr., 920 F.3d 192, 200 (4th Cir. 2019). In response to the defendants' motion, Hamlet relies on Virginia Code § 19.2-303 to support the proposition that "only the court . . . can place a person on GPS monitoring." Pl.'s Resp. Summ. J., ECF No. 28, at 4. This statute provides that the trial court, after conviction, may suspend all or part of a sentence and "place the defendant on probation under such conditions as the court shall determine, including monitoring by a GPS . . . tracking device, or other similar device." Va. Code Ann. § 19.2-303. Notably, however, the statute does not prohibit the court from making a condition of probation a requirement that the probationer comply with the rules and requirements set by the probation officer, as the circuit court did in Hamlet's case, and no federal or state appellate court has held that trial courts have sole

authority under § 19.2-303 to impose GPS monitoring as a condition of probation.[4] Likewise, no federal or state appellate court has addressed the constitutional validity of the provisions of VDOC OP 435.5 that permit probation offices to independently use electronic monitoring as a probation tool in certain cases. Thus, it was not clearly established that Hamlet had a state-created liberty interest in avoiding being placed on GPS monitoring or that such condition could not be imposed without a hearing or a court order. For these reasons, the court concludes that the defendants are entitled to qualified immunity on Hamlet's procedural due process claim under the Fourteenth Amendment.

### C.  Fourth Amendment

Hamlet next asserts that the defendants violated his Fourth Amendment rights by requiring him to wear a GPS tracking device as a condition of his probation. See, e.g., Compl. 18 ("[Defendants] imposed the GPS monitoring special condition . . . [i]n violation of my 4th Amendment rights to be free from unreasonable searches and seizures by placing a GPS tracking device to my body."). The defendants are also entitled to qualified immunity on this claim.

---

[4] In August 2022, after this action was filed, a three-judge panel of the Court of Appeals of Virginia declined to address whether "courts have sole authority under Code § 19.2-303 to impose GPS monitoring as a condition of probation" since the appellant had not specifically raised the issue. Smith v. Commonwealth, No. 1341-21-2, 2022 WL 3362708, at *5 n.6 (Va. Ct. App. Aug. 16, 2022). Nonetheless, the panel rejected the appellant's argument that language in a different Virginia statute "mandating that the court shall order GPS monitoring in certain cases [indicated] that the General Assembly did not intend to delegate such power to [the VDOC] in the absence of action by the trial court." Id. Instead, the panel concluded that the appellant's "probation officer had independent authority under Title 53.1 of the Code to impose the GPS requirement" and that the statutory language on which the appellant relied did "not undermine that authority." Id.; see also Va. Code Ann. § 53.1-145 (providing that a probation officer must perform all "duties as may be required of him by the Director [of the VDOC] and the court or judge by whom he was authorized" and that those duties include the responsibility to "[s]upervise and assist all persons within his territory placed on probation").

The Supreme Court has held that GPS monitoring by means of an ankle bracelet constitutes a search under the Fourth Amendment. Grady v. North Carolina, 575 U.S. 306, 310 (2015). "That conclusion, however, does not decide the ultimate question of the [condition's] constitutionality," since "[t]he Fourth Amendment prohibits only unreasonable searches." Id. "The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." Id.

Although "the Supreme Court has held that GPS monitoring can be an intrusion into the privacy of ordinary citizens," United States v. Russell, 45 F.4th 436, 440 (D.C. Cir. 2022), Hamlet was not an ordinary citizen at the time he was placed on GPS monitoring. Instead, he was a probationer under the supervision of the defendants. As a probationer, Hamlet did "not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'" Griffin v. Wisconsin, 483 U.S. 868, 874 (1987) (alteration in original). "The Supreme Court 'has repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment.'" Jones v. Chandrasuwan, 820 F.3d 685, 692 (4th Cir. 2016) (quoting Samson v. California, 547 U.S. 843, 853 (2006)). Thus, "[a] person's status as a probationer informs both sides of [the] reasonableness balance": the extent to which a search or seizure intrudes upon an individual's privacy and the degree to which it is necessary to promote legitimate governmental interests." Id.

As other courts have recognized, "GPS requirements, location monitoring, and curfews are special conditions often used by courts, pretrial services agencies, probation offices, and parole commissions to either safeguard the community or minimize the risk of flight." Chandler, 60 F. Supp. 3d at 222; see also Russell, 45 F.4th at 441 (emphasizing that "appellate courts have repeatedly affirmed decisions to condition a child-sex offender's supervised release on GPS monitoring" and that "even outside the context of child-sex crimes, '[c]ourts routinely rely on GPS technology to supervise individuals on probation or supervised release'") (quoting United States v. Brooks, 715 F.3d 1069, 1078 (8th Cir. 2013)). It is undisputed that the VDOC permits its probation officers to use GPS monitoring as a supervision tool in high-risk cases in which an offender's behavior or history justifies electronic monitoring and that the decision to place Hamlet on GPS monitoring was determined to be necessary based on his history of violence and threatening behavior. The court has been unable to locate any controlling authority from the Supreme Court, the Fourth Circuit, or the Supreme Court of Virginia that would have alerted a reasonable probation officer that requiring Hamlet to wear a GPS device would violate the Fourth Amendment. Additionally, there is no "robust consensus of persuasive authority" indicating that Hamlet's Fourth Amendment rights were violated. Booker, 855 F.3d at 544. Because it was not clearly established that the defendants' conduct violated the Fourth Amendment, the defendants are entitled to qualified immunity.

### D. First Amendment

Qualified immunity also stands in the way of Hamlet's claim that the defendants violated his "First Amendment right to travel" by imposing the "GPS monitoring condition"

and a "10 p.m. curfew." Compl. 19; see also id. (alleging that he "could not go where [he] wanted to go" as a result of the conditions and that he was allegedly told that he "could not travel out of state"). "The Supreme Court has limited First Amendment protections to what it has called 'inherently expressive' conduct," Falcone v. Dickstein, 92 F.4th 193, 206 (3d Cir. 2024) (quoting Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 66 (2006)), and courts have held that the act of traveling itself is "not inherently expressive," Clancy v. Geithner, 559 F.3d 595, 605 (7th Cir. 2009) (concluding that international travel restrictions did not violate the First Amendment). Additionally, courts have recognized that "[a] restriction on travel can be a valid condition of probation." United States v. Friedberg, 78 F.3d 94, 97 (2d Cir. 1996); see also Clancy v. Fla. Dep't of Corr., 782 F. App'x 779, 781 (11th Cir. 2019) ("Though the Privileges and Immunities Clause protects a constitutional right to travel, see Saenz v. Roe, 526 U.S. 489, 503 (1999), this right can be lawfully abridged by the conditions of a criminal sentence, including probation."); United States v. Llantada, 815 F.3d 679, 683 (10th Cir. 2016) ("[W]e reject [defendant's] argument that the condition [prohibiting him from leaving the judicial district without permission] is an unreasonable or unnecessary limitation on his right to travel. [Defendant] points to no federal case with such a holding, and the government provides ample reasons for limiting a person on supervised release to a single judicial district. For example, probation officers have an easier time contacting and speaking with an offender if he is limited to a single area. In addition, such a restriction acts as a deterrent to criminal conduct, which comports with the policy goals of federal sentencing law."); United States v. Warren, 186 F.3d 358, 365 (3d Cir. 1999) ("Standard conditions of probation include restrictions on a defendant's right to travel."); Hashim v. Nelson-Clash, No. 7:12-cv-01892,

2013 WL 80155, at *9 (D. Md. Jan. 4, 2013) ("[F]ollowing his conviction and during his sentence and status as a parolee and probationer, Plaintiff did not have the right to unfettered travel or to control where he lived.") (citing <u>Williams v. Wisconsin</u>, 336 F.3d 576, 581 (7th Cir. 2003)).

Against this backdrop, it cannot be said that every reasonable probation officer would have understood that restricting Hamlet's ability to travel while on supervised probation would violate the First Amendment or any other provision of the Constitution. Accordingly, the defendants are entitled to qualified immunity with respect to this claim.

### E. Eighth Amendment

Hamlet's Eighth Amendment claim fares no better. <u>See</u> Compl. 7–8 (alleging that "GPS monitoring is punitive in effect" and that the defendants "subjected [him] to what amounts to cruel and unusual punishment"). The Supreme Court has held that the Cruel and Unusual Punishments Clause of the Eighth Amendment "prohibits the imposition of barbaric punishments under all circumstances" and "extreme sentences that are grossly disproportionate to the crime." <u>Graham v. Florida</u>, 560 U.S. 48, 59–60 (2010). The court has not identified any controlling or persuasive authority that would have put the defendants on notice that assigning Hamlet to GPS monitoring would be considered so barbaric or excessive as to violate the Eighth Amendment. Indeed, at the time of the events in question, courts had held that having to wear an ankle monitor is not a form of punishment at all, let alone cruel and unusual punishment. <u>See</u> <u>Belleau</u>, 811 F.3d at 937 ("Having to wear [a GPS] monitor is a bother, an inconvenience, an annoyance, but no more is punishment than being stopped by a police officer on the highway and asked to show your driver's license is punishment . . . .");

Doe v. Bredesen, 507 F.3d 998, 1005 (6th Cir. 2007) (holding that having to wear a GPS monitoring device is not sufficiently disabling to be considered punitive); Sipes v. Sampson, No. 2:08-cv-00213, 2009 WL 2488085, at *5 (W.D. Mich. Aug. 13, 2009) (reasoning that "since the mere fact of incarceration does not violate the Eighth Amendment, the condition of parole to wear and fund a GPS monitoring system does not either"). Consequently, qualified immunity also bars Hamlet's Eighth Amendment claim.

### F.  Fifth Amendment

For similar reasons, the defendants are entitled to qualified immunity on Hamlet's claim that they violated the Double Jeopardy Clause of the Fifth Amendment by assigning him to GPS monitoring.

The Double Jeopardy Clause provides that no person "shall be . . . subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "It prohibits successive governmental criminal prosecutions and successive governmental punishments for the same conduct." United States v. Bank, 965 F.3d 287, 293 (4th Cir. 2020) (emphasis in original). Significantly, however, the "Double Jeopardy Clause does not prohibit the imposition of any additional sanction that could, in common parlance, be described as punishment." Hudson v. United States, 522 U.S. 93, 98–99 (1997). Instead, it "protects only against the imposition of multiple criminal punishments for the same offense, and then only when such occurs in successive proceedings." Id. at 99 (emphasis in original). The Supreme Cour has also made clear that "[t]he Double Jeopardy Clause does not provide the defendant with the right to know at any specific moment in time what the exact limit of his punishment will turn out to be." United States v. DiFrancesco, 449 U.S. 117, 137 (1980). Consequently, in

determining "whether an increase in [a defendant's] sentence is essentially a multiple punishment for the same offense," courts must consider "whether the defendant had a legitimate expectation of finality as to the severity of his sentence." United States v. Bellow, 767 F.2d 1065, 1070 (4th Cir. 1985).

In this case, the conditions of Hamlet's suspended sentence included a requirement that he "comply with all the rules and requirements set by the Probation Officer" while on supervised probation, Sentencing Order at 3, and the applicable VDOC policy granted probation officers the discretion to use GPS monitoring as a supervision tool if warranted by a probationer's history or behavior. Based on the circuit court's order, the VDOC policy, and existing case law, the court cannot say that every reasonable probation officer would have understood that assigning Hamlet to GPS monitoring upon his release to supervision would violate the Double Jeopardy Clause. See, e.g., United States v. Serrapio, 754 F.3d 1312, 1320 (11th Cir. 2014) (concluding that a modification to a defendant's conditions of probation that increased the period of home confinement with electronic monitoring did not violate the Double Jeopardy Clause because the defendant did not have a legitimate expectation that his conditions of probation would remain the same for the entire term); see also id. at n.2 (noting that state courts appeared to be somewhat divided on the question addressed and that while "[s]ome hold that, absent revocation, the Double Jeopardy Clause prohibits the modification of conditions of probation or supervised release if the new conditions are more restrictive[,] . . . [o]thers conclude that there is no violation of the Double Jeopardy Clause because the conditions of probation or supervised release do not constitute punishment, or that the modification is constitutionally permissible because a defendant on probation or supervised

release does not have a legitimate expectation that his conditions will remain unchanged")
(collecting cases). Because existing precedent did not place the double jeopardy question at
issue in this case "beyond debate," the defendants are entitled to qualified immunity. Sharpe,
59 F.4th at 683.

### G. Unconstitutional Conditions Doctrine

Hamlet also claims that the defendants violated the "unconstitutional conditions
doctrine" by threatening him to send him back to jail if he did not sign the GPS monitoring
forms. See Compl. 8; see also Pl.' Resp. M. Summ. J. 10 (asserting that the defendants "told
[him] to put the GPS device on or else they would send him [back] to prison that day"). The
Supreme Court has explained that "the unconstitutional conditions doctrine . . . vindicates the
Constitution's enumerated rights by preventing the government from coercing people into
giving them up." Koontz v. St. Johns River Water Mgmt. Dist. 570 U.S. 595, 604 (2013). "A
predicate for any unconstitutional conditions claim is that the government could not have
constitutionally ordered the person asserting the claim to do what it attempted to pressure that
person into doing." Id. at 612. This is because a "condition cannot be unconstitutional if it
could be constitutionally imposed directly." Forum for Academic and Institutional Rights,
Inc., 547 U.S. at 59–60; see also Andre-Rodney v. Hochul, 618 F. Supp. 3d 72, 85 (N.D.N.Y.
2022) (concluding the plaintiffs "failed to allege a required predicate of an unconstitutional
conditions claim since they had not plausibly alleged that the state could not directly impose a
vaccination requirement").

For the reasons set forth above, the defendants did not violate any clearly established
constitutional right by requiring Hamlet to submit to electronic monitoring as a condition of

supervised probation. It necessarily follows that the defendants are entitled to qualified immunity on Hamlet's claim that their actions violated the unconstitutional conditions doctrine. See, e.g., Children's Health Def., Inc. v. Rutgers, 93 F.4th 66, 80 (3d Cir. 2024) (noting that the court's conclusion that the plaintiffs failed to state a due process claim also resolved their related claim under the unconstitutional conditions doctrine).

### H. Conspiracy

In his final claim under § 1983, Hamlet asserts that the defendants conspired to deprive him of his constitutional rights. "To establish a conspiracy claim under § 1983, a plaintiff must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right." Massey v. Ojaniit, 759 F.3d 343, 357–58 (4th Cir. 2014) (alternations in original).

As explained above, the defendants are entitled to qualified immunity on the underlying constitutional claims asserted against them. Consequently, "they are entitled to judgment on the corresponding conspiracy claims." Gill v. City of Milwaukee, 850 F.3d 335, 342 (7th Cir. 2017); see also N.E.L. v. Douglas Cnty., 740 F. App'x 920, 931 n.22 (10th Cir. 2018) ("Because Adame and Deputy Garza are entitled to qualified immunity against N.E.L. and M.M.A.'s Fourth Amendment and Fourteenth Amendment claims, they are also entitled to such qualified immunity against N.E.L. and M.M.A.'s civil conspiracy claim based on the alleged violations of those same rights.'); Conner v. Heiman, 672 F.3d 1126, 1133 (9th Cir. 2012) ("The finding that Neil and Heiman have qualified immunity also bars Conner's § 1983 conspiracy claim," since "a § 1983 conspiracy claim is not a means of holding state actors liable on claims from which they are otherwise immune."); Hale v. Townley, 45 F.3d 914, 921 (5th

Cir. 1995) ("[I]n this case, all officers alleged to have violated Hale's First Amendment rights are entitled to qualified immunity. Therefore, the conspiracy clam is not actionable.").

## Conclusion

For the reasons stated, the court concludes that qualified immunity bars Hamlet's claims under § 1983 because the defendants did not violate any clearly established constitutional right. Accordingly, the defendants' motion for summary judgment, ECF No. 23, is **GRANTED**. An appropriate order will be entered.

Entered: May 3, 2024

Michael F. Urbanski
Chief U.S. District Judge
2024.05.03 14:20:59 -04'00'

Michael F. Urbanski
Chief United States District Judge